Kirkendall, I believe that's how it should be spelled, and Snyder v. Halliburton. It is Kirkendall, right? Yes. Thanks. We'll make sure the caption is correct. Mr. Rhodes, good morning. Good morning. May it please the court. I'm David Bennett Rhodes, and I'm here for the appellants, plaintiffs in the court below. The plaintiffs were, or are, employees of what originated as a joint venture called Dresser Rand Company. It was an equal or approximately equal joint venture between Ingersoll Rand and the Dresser Company, Dresser Industries, Inc., actually. And they were participants in the Dresser Consolidated Plan, which we call the DICON plan, which had a very generous early retirement subsidized benefit for people who left service with the company when they were between the ages of 55 and 65. In order to qualify for that benefit, they had to continue their service with the company, and under a particular provision of the DICON plan relating to Dresser Rand, service with Dresser Rand counted as service for purposes of qualifying for this benefit. Can I just ask a clarifying question about that? Yes. I'm not sure it's relevant to the outcome of the case, but did they continue to earn credit? In other words, the longer they continued to work for Dresser Rand, did their benefits get larger? No. No. That's what I thought. So this is just a question of their eligibility to get benefits that had been earned in the first place while they were working for, really for Dresser, before Dresser Rand. Well, no, actually, while they were, yes, while they were working for Dresser before Dresser Rand, and we would say those benefits accrued by then, but they would get a generously subsidized early version of those benefits if they qualified by being 55 years old when they had a separation from service. My question is, did those benefits under this plan, if you were to prevail, get bigger during the time they worked for Dresser Rand? No, Your Honor, they did not. They got service credit, but they did not, but they didn't get the credit that they needed in order for them to collect any benefit based on the years they had worked, not just before Halliburton took over, but before even they transferred over to Dresser Rand. Well, the service credit was necessary to stop there being a separation from service, and a separation from service triggers a couple of things. It triggers the eligibility to receive the benefit that they had previously earned, but it also triggers this subsidized benefit if they are at least 55 years and not yet 65 years. So the key issue on the merits there, and we've raised two issues. One has to do with the standard of review, with the arbitrary and capricious standard, which is first in the briefs, but I'd like to go to it second, if I may, because I think that under either standard of review, we should prevail. Because this court said in the Miles decision, which is quoted and cited at pages 20 to 21 of my principal brief, that where the trustees of a plan impose a standard not required by the plan's provisions or interpret the plan in a manner inconsistent with its plain words, their actions may well be found to be arbitrary and capricious. And that's what happened in this case. In this case, the plan provided that an employee's service with DR shall be counted as continuous service under this plan. The parties don't dispute that that operative language means that if the employees continue to have service with DR, then they should qualify for this benefit if indeed they met the other requirements for it. What the parties dispute is whether continuing service with Dresser Rand Company was service with DR after Halliburton acquired Dresser and Hall Rand, and they've had different justifications for why that stops service with DR. But what they're saying at this point is that when Dresser was no longer an owner of Dresser Rand, it was no longer the company contemplated in the provision. The district court actually looked at language about a related entity, which is in the definition in the plan, and said that that's one way you could continue to get service credit is if you're working for a related entity, which is one in which Dresser has a substantial interest, and this was no longer a related entity. But it's without question that related entity language doesn't apply. What you're talking about, your argument is that a related entity is a different way of getting credit. You're relying on a different provision. Yes, and I'd like to add though, that if the plan author had intended that you had to be working for Dresser, for DR, and by the way, DR is a defined term. It says on record, page 457, the second to last line of the page, it says Dresser Rand Company, parenthesis, quote DR, close parenthesis. And service with DR is enough. If you had to be working for DR, or for Dresser Rand Company, and Dresser had to own an interest, they could have said so long as it's a related entity, it would be that simple, but it's not in there. We submit that the trustees have imposed a standard not required by the plan's provisions. That is, you have to not only work for DR, but DR has to continue to be owned partly by Dresser. And that's not in. I have a dumb question, excuse me, but the company still is called Dresser Rand, even after Dresser doesn't own it? Yes, yes, it continued with the same name, and it was not wound up, and it was a partnership under New York law. And there's no question that because it wasn't wound up, and the employees went to the same job at the same locations, that they were still working for the same company. But the defendants are arguing that there's an additional requirement that you have to tease out of this somehow, and it's not expressed there. And I submit that it's arbitrary and capricious to add an additional requirement that's not expressed in the plan. Then I would point out that Dresser Rand underwent a further reorganization, subsequently, in which it's now Dresser, I believe Dresser Rand Inc. They reformed as a corporation, and we agree that they're not any longer the DR contemplated in here. That after that event, there was a separation of service under this plan. But that's not what's at issue in this appeal. Would you just articulate for me as succinctly as you can this additional condition that you just referred to a moment ago? So yes, your honor, the plan expressly says that you get service, which is what counts, if you're working with DR, and DR is defined to be Dresser Rand. And it's recited to be a- What's the additional condition? The additional requirement is that Dresser Rand continue to be owned in part by Dresser Company. And that's not a requirement in the language of the plan. I see my time is up and I will- You deserve some time for- I did, and in the meantime, I'll stand on my brief on our other issue about the standard of arbitrary and capricious. Thank you, Mr. Rowe. Thank you. Mr. Dvoretsky. Good morning, your honors, and may it please the court. Shai Dvoretsky with Jones Day on behalf of the Appleese. I'd like to talk about both the standard of review, which is- Well, why don't you talk about exactly what Mr. Rhodes is relying on. Could you tell me what language in the plan the committee was interpreting when they decided that these folks no longer were eligible? Sure, I think that the committee was interpreting what DR is. Section 12.03 allows the plan participants- So what language in the plan explains what DR is? So let me point to two things. First, DR is a general partnership organized under the laws of the state of New York. So it's pointing to a specific partnership. It says it is a partnership. Did it continue to be a partnership after the events that you're relying on? It did not. It had two partners, Dresser and Ingersoll Rand, and Dresser, owned by Halliburton, sold its interest. At that point, this two-entity partnership went to being owned by one entity, just by Ingersoll. That's not a partnership anymore as a matter of New York law. Mr. Rhodes asserted that the entity continued to wind up its affairs. The agreement at issue, the sale agreement, actually said that it was not going to wind up its affairs. And it expressly says that. That's in the- When did it turn into a corporation? I'm not sure exactly what its history was after the sale. What was it after, if it was not a partnership and it was not yet a corporation, what was it after this agreement? It was just an entity owned by Ingersoll Rand. I don't know what form of entity it was, but it was not a partnership because it would have only had one partner. You don't think of a partnership as a sole proprietorship, in effect. The other language, which Judge Lynch, you asked about, that I think is important to emphasize is that in section 12.03, at the end, it also talks about employment with DR or any successor thereof. And so section 12.03, which is the provision that is allowing the plan participants to continue to earn vesting credit after they were no longer DRESER employees, after they worked for DRESER Rand, also contemplates that there's a distinction between DRESER Rand and a successor. And that poses an interpretive question that section 6.03 of the plan allows the plan administrator to determine and is entitled to deference for that determination. It's an interpretive question. I'm having trouble understanding what is interpretive because I read this. It says, following our provisions describing the benefits payable from the plan for employees of the company as of December 31, 1986, who become employees of DRESER Rand company pursuant to organizational agreement between the company, etc., right? So, this is going to tell you what benefits they're entitled to. And then later it talks about employment with DR. Now, so the language you really are relying on has to be the definition of DR, whatever that is in the plan, right? Well, what we're actually relying on is what service with DR means. But let me step back for a minute, and I think you started to ask Mr. Rhodes this as well, just to talk about what kind of benefit this is, how it was earned under the plan, and what happened when there were ownership changes in the plan. I'm a simple person. I'm trying to understand, this is about whether the committee has arbitrarily and capriciously interpreted language in the plan, or whether they've added a new requirement, as Mr. Rhodes suggests. And I'm just trying to get at, what is the language that you are looking at, and what is the interpretation that is being put on that language? So, the language that we are looking at is, what is service with DR? Because the only way that these former dresser employees can continue to earn vesting credit is if they are performing service with DR. That's what 1203 provides, and without 1203, under 1012 and 145, and I'm sorry to be throwing out these numbers, but that's how these RISA cases go. Without- Service means service, right? Service means they keep working. That's working, that's service. With DR. With DR. So, the question is, what is DR? Right, the question is, are they continuing to work for DR, or, as an interpretive matter, is it some other entity? When this fellow goes to work in the morning, he goes into a door that says, Dresser Rand, and that continues throughout. That's who he's working for, is Dresser Rand, right? That's true in terms of the sign on the door, but what if, instead of calling it Dresser Rand, Ingersoll had decided to just call it Ingersoll? At that point, would it still be Dresser Rand, or would it be something else? This can't all just turn on the name change. I assume it would then be a successor to Dresser Rand, if they changed what it was. Well, one possible interpretation of the plan is that the difference between DR and successor turns entirely on the name plate on the door. That's not the only possible interpretation of the plan, and the plan administrator gets discretion to determine what the line is between- What makes that a reasonable interpretation? What makes it a- Or a plausible interpretation, or they can't just say, I'm interpreting white to mean black because I have discretion to make it mean that. No. It has to be a reasonable interpretation, yeah? Of course it has to be a reasonable interpretation. What makes it a reasonable interpretation here is that it underwent a fundamental change in the interests of its owners. It went from having two owners to one. It went from being a partnership to being a single entity. It went from being a general partnership organized under the state of the laws of New York, which is what 1203 provides, to being some other form of corporate entity. And so a name change is one way to make the determination, but that's not the only way to draw the line between what's the- What exactly in the record tells us that it stopped being a general partnership? You're saying it automatically does because one company now owns both entities that formed the partnership. Right, and so Joint Appendix 676, that's where the agreement is for the sale of Dresser Rand. It says it shall be immediately reconstituted without termination and without the necessity of winding up the partnership affair. So it was reconstituted at that point as a different entity. Now, again, whether it's a name change, whether it's being reconstituted as a different entity, whether it's becoming an LLC- What does reconstituted mean then? I mean, you know, this sort of turtles all the way down. We have to trace through each of these things, steps in the argument, and see if they're reasonable. What reconstituted as what? Is there anything in there? Or is that also something that the committee has to interpret? Well, so it just says the partnership shall be immediately reconstituted without termination and without the necessity of winding up any of the partnership affairs. It doesn't say reconstituted as what. But again, I think these are the sorts of questions that the committee gets deference to determine. It's not just a matter of the nameplate on the door. And there are other provisions in this plan that show that the plan was in fact concerned with different kinds of corporate ownership. If you look at section 1012, for example. Which is where? Which is in the record of Joint Appendix 428. Section 1012 said that a dresser employee ceases to be employed by the employer because of a joint venture creation, sale, transfer, or other disposition involving all or part of the employer's business. Now, that doesn't apply to dresser Rand, because 1203 specifically deals with dresser Rand. But the reason I'm relying on that language is to show that the plan contemplated that you could have a termination as a result of a sale, transfer, or other disposition involving the employer's business. That's what happened here. This was this kind of transaction. It also makes sense to think of these early retirement benefits in that way. The reason that employers set up these early retirement incentives is to create an incentive for some turnover in their workforce. Some employers want that. There is no reason, however, that company A would want to create an incentive for people to retire from company B, from somebody else's business. And so it makes sense that these things, these kinds of early retirement benefits would be set up and would be construed so that you're no longer earning vesting service to create an incentive for early retirement once you're no longer working for that employer. On the standard of review question- Part of the problem I'm having is it really is the same employer. I mean, it's changed its structure, but to the worker, it's the same darn thing. To the worker, I suppose it's the same thing, they're going to the work in the same place. But from the plan sponsor's perspective, it's an entirely different entity that the plan sponsor no longer has an interest in. And so- But the plan sponsor, when it set that up, could have made perfectly clear what was going to happen if anybody ever sold it or something like that. Instead, they seem to make a turn on whether you continue to work for DR. Indeed, you're no longer really working. It's a funny kind of thing, right? Because Dresser was assuming the liability for this retirement plan, even though these people worked for an entity that was only half DR, was also half Ingersoll. And there's nothing that says Ingersoll is now taking on any liability here, right? Again, Judge Lynch, though, I think that's the interpretive question for which there's- That's not an interpretive question. On day one, 1987, January 1st, 1987, these people are working for an entity that is half owned by Ingersoll, and they are covered by a plan that is 100% funded by Dresser. That's true, but the- So why are we thinking that Dresser, when it sets up this plan, is thinking about the future and thinking, well, we only want to be responsible for encouraging turnover and early retirement when we own it and we're getting some benefit, when they're already subsidizing 100% of something that's 50% for the benefit of Ingersoll? Because what Dresser was clearly thinking about in this plan was the distinction between Dresser and its successor. So they were thinking about ownership interests. And the interpretive question, again, becomes how you draw that line here. And that's what, to your point, I think most ERISA plans could be written more clearly. You can always look at them and say- Anything can be written. You can always say, why didn't they say it more clearly? The point of arbitrary and capricious review is that the plan administrator gets to make that determination. And section 6.03 of the plan here gives the administrator, in this case, that discretion. Thank you. Thank you, your honors. Rhodes, you've reserved two minutes. Yes, your honors. Under New York partnership law, Dresser Rand Company continued to be a New York partnership after it only had one partner. It does not have any effect on the fundamental nature of the- How do we know that? Is there some citation, some source we can look at? Well, yes. Actually, your honor, I apologize for this, but this case has been pending a long time in the district court. We fully briefed this issue, and I believe that the defendant strategically retreated from it and didn't take the position on this set of motions that is up on appeal. That it's now taking in the argument. In any event, I would like an opportunity to send the court a post-argument letter, giving it what was actually filed in the lower court on this very issue, because I think it's dispositive of that particular argument. I'd like to reiterate that no matter how they slice this about what the fundamental form is, and by the way, as our brief indicates, in October of 2004, so about four and a half years later, it did undergo a fundamental change. It became a corporation, DR Inc. But until that time, it was governed by New York laws, a New York partnership, and it was DR as defined. And what's happened is they've added a requirement. I'd like to just point out that this shifting justification is what makes important the point that when the plan committee does not actually interpret actual language. And instead makes a decision to ratify a business choice, and that's what the record indicates happened here. And then the reasons for that decision get changed again and again during the course of litigation. It's not appropriate to apply deference. Here's the question I have about that. When they make a decision, whatever they call it, whether they call it ratifying somebody else's decision or making a decision, it is their responsibility as trustees. Is it not to decide that question in accordance with the plan? It is, but we shouldn't presume that they've done so. Well, that's the question. So what would they have to do in order to gain the deference of the arbitrary and capricious standard? Would they have to write an opinion saying, here's why we are ratifying this choice, because we interpret the plan this way? No, your honor, I don't think so, but I think that answering this court's initial questions, what language are you interpreting and how are you interpreting it, would be a major step. They'd have to write an opinion. And they'd have to say, this is the language we're interpreting and here's the interpretation we're giving it, and therefore we decide as follows. Or perhaps a step short of that could be a discussion was had about the interpretation of the meaning of DR, and the plan has decided that it's no longer DR. Do we have to parse the minutes because the minutes said they ratified a decision and did not say we discussed it first? Well, that's- If it said we discussed the meaning of the plan and decided to ratify the decision, then they'd be entitled to the arbitrary and capricious standard? Well, two quick things. Yes, that's what the Munch case that's cited in our brief says, from the Third Circuit. There's a whole passage from that on about page 15 or so. And the second thing is, or maybe a little earlier, sorry. The second thing is that actually what should happen is they should be pinned down to a particular interpretation, rather than let their lawyers go all over the board to shop something that the court might like. That would have happened, and I understand that we held, I think correctly, that you didn't have to do it. But that would have happened if the administrator of remedies had been exhausted. If someone had come in and said, we're challenging this interpretation, and then the plan administrator said, no, no, no, this is our interpretation. This is why you lose, then we'd have such an opinion, presumably. But we don't, because that was never done. And what we've got is they made this decision without explaining themselves. And so I'm having a little trouble understanding why we should assume, attribute to them, I don't know what, decide that they didn't really decide the question. They didn't really interpret anything, and therefore they don't get any deference. Well, your honor, I guess it's a question of how much deference or deference to what. Because the court in this case appeared to apply a standard where if the defendants, after multiple tries, can come up with a theory that the court thinks is plausible. Or if the court itself can come up with a theory, as it did in taking something that both sides agree is not applicable in this definition of a related entity. Then as long as there exists a theory that's plausible, deference requires that we assume that's what the actual interpretation was. And I think that the standard that the Third Circuit has enunciated in Munch is much more workable. That you defer to actual considered interpretation of plan language, and there's nothing in the record to show that. If- What about the PowerPoint presentation that was given to the employees back in, I want to say 2002, if I have this correct? Yes. I thought it was the case that somebody told the employees a theory that sounds pretty much like what the defendant is arguing here. Back at that point, as an explanation for why they were losing this benefit. They did indeed, and that's why we briefed it in the court below. But it shifted by the time of the present motions to what the defendant's theory at the time was, that something they called dresserless RAND wasn't the same as dresser RAND. Once dresser wasn't in there, it wasn't really dresser RAND, despite the form of the company. That was not what the PowerPoint presentation said? The PowerPoint presentation said that it ceased to be a partnership under New York law, if I remember correctly. That's the point that- I'm making back again. It's derived at the oral argument, is that it's not a partnership, not that it's who's the partners. Right, I believe that's the case, your honor. I would like to ask permission to send the court something communicating, not re-arguing, but giving- We will handle that as we'll enter it. If we want that, after we conference the case, we will enter an order, and then- Okay. And what I'm talking about is some- Opportunity to respond. I'm sorry, your honor. I'm talking about something that does exist in the record as it stands now, but as far as I know, in the reproduced record. I understand, and we can certainly review the oral argument as it has been presented here, so we'll be aware of what you've said earlier. Thank you, your honor. Thank you both. We'll reserve decision.